United States Courts Southern
District of Texas
FILED
*07/01/2021*
Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| v.  § | **Criminal No. 4:21-cr-364** |
| § | |
| **LEE TIPPETT,** § | |
| § | |
| **Defendant.** § | |

## INFORMATION

THE UNITED STATES CHARGES:

### General Allegations

At all times material to this Information, unless otherwise specified:

### Relevant Market Background

1.  Natural gas was an energy commodity that was traded by buyers and sellers who bought and sold natural gas through different types of commercial transactions.

2.  One way to trade natural gas was to buy or sell a "futures contract." A futures contract was an agreement that obligated the contracting parties to buy or sell a product or financial instrument at a fixed quantity and price for delivery at a specific date and time in the future.

3.  Futures contracts were traded on exchanges—designated commodities markets regulated by the United States Commodity Futures Trading Commission ("CFTC"), including the New York Mercantile Exchange, Inc. ("NYMEX") and the Chicago Mercantile Exchange ("CME"), which operated through servers located in or around Chicago and Aurora, Illinois, and ICE Futures U.S., Inc. ("ICE"), which operated through servers located in or around Chicago, Illinois. ICE, NYMEX, and CME each listed different products for trading, including natural gas futures contracts, and determined and enforced rules and procedures for trading on the exchange.

4. Natural gas traded at different prices at different physical delivery points throughout the United States. "Henry Hub"—the delivery location (or hub) near Louisiana's Gulf Coast that connected several intrastate and interstate pipelines—was used as the standard pricing reference for natural gas futures contracts. The price of natural gas was driven by supply and demand, which was impacted by various factors, including stored gas reserves and the weather.

5. The exchanges offered the opportunity to trade in Henry Hub futures contracts, which were priced based upon the price of natural gas at the Henry Hub delivery point during specified time periods.

6. A trader could place an order either to buy (a "bid") or to sell (an "offer") a certain quantity expressed in the number of contracts of a specific futures contract. An order was "filled" when a buyer's bid price and a seller's offer price matched for a particular futures contract. A trader who purchased a commodity established a "long" position; a trader who sold a commodity established a "short" position.

7. Offsetting trades were opposite transactions for an equal number of contracts of the same delivery month that liquidated a purchase or sale of futures contracts and "closed" a position. By offsetting a futures contract, a trader canceled any delivery obligation of the underlying commodity. The net gain or loss on the trade was equal to the difference between the price of the futures contract when the trade was initiated and the price when it is offset.

8. Futures contracts could be traded on exchanges directly through their electronic platforms or through a registered broker who served as an intermediary to match a willing buyer and seller. After matching a willing buyer and seller, a broker then submitted the executed trade to an exchange for reporting and clearing. Brokers were prohibited from taking the other side of a customer's order absent written consent from the customer and compliance with exchange rules.

9. With limited exceptions, all purchases and sales of commodity futures were required to be executed openly and competitively. One exception to this requirement was for certain trades, such as block trades, that complied with specific requirements under the exchange rules. Block trades were permissible, privately-negotiated transactions that met certain exchange-determined quantity thresholds and were reported to and entered on the exchange for price reporting and clearing. While block trades were not negotiated on the open market, under exchange rules, block trades were required to be executed at fair and reasonable prices, taking into account, among other factors, the circumstances and prices of the market.

10. Fictitious sales were prohibited trades that were not bona fide, arms-length transactions. Trades that negated market risk and competition, such as prearranged trades that were noncompetitive trades based on an express or implied agreement or understanding and predetermined terms, and accommodation trades that were noncompetitive trades intended to assist another person's illegal trades, were considered prohibited fictitious sales.

## The Defendant, His Co-Conspirators, and Relevant Entities

11. The Defendant, **LEE TIPPETT** ("**TIPPETT**"), was a resident of Houston, Texas, and Jacksonville, Florida. Between in or around 2013 and in or around 2015, **TIPPETT** was paid as an employee of MDW Consulting LLC ("MDW"). Between in or around 2016 and in or around 2019, **TIPPETT** was paid as an employee of Classic Energy.

12. Mathew Webb ("Webb") was a resident of Houston, Texas. Webb created and controlled MDW and Classic Energy.

13. Person 1 was a resident of Houston, Texas. Between 2013 and in or around 2019 Person 1 was employed in various positions at Company B including natural gas trader, Director of East Trading, and President.

14. MDW was a company in Houston, Texas, created by Webb for his personal investments and business. MDW operated as a trading firm using the trade name MDW Capital LLC ("MDW Capital").

15. Classic Energy was a registered brokerage firm in Houston, Texas, created by Webb, which provided brokerage services in various commodities energy markets in exchange for commission fees. Among the services Classic Energy provided was to facilitate block trades in natural gas futures contracts between its customers and others in the market.

16. Company B, located in Houston, Texas, was an energy company that engaged in, among other business, the trading of natural gas products in the United States. Company B was a customer of Classic Energy.

## **COUNT ONE**
**(18 U.S.C. § 371 – Conspiracy)**

17. Paragraphs 1 through 16 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

18. Beginning in or around 2013 and continuing through at least in or around 2019, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendant

**LEE TIPPETT**

knowingly and willfully, that is, with the intent to further the objects of the conspiracy, conspired and agreed with other individuals, known and unknown, to commit certain offenses against the United States, namely:

    a. honest services wire fraud, that is, to knowingly and intentionally devise a scheme and artifice to defraud, and to deprive Person 1's employer,

4

        Company B, of its intangible right to his honest services through bribery and kickbacks, in violation of Title 18, United States Code, Sections 1343 and 1346; and

    b.    commodities fraud, that is, to knowingly and intentionally devise a scheme and artifice to defraud a person in connection with a commodity for future delivery in violation of Title 18, United States Code, Section 1348(1).

## Purpose of the Conspiracy

19. The purpose of the conspiracy was for **TIPPETT** and his co-conspirators to: (a) enrich themselves from the profits derived from fraudulent and unlawful trading practices and misappropriation of material, nonpublic information, and (b) conceal their fraudulent and unlawful activities from Company B, market participants, the exchanges, the CFTC, and law enforcement.

## Manner and Means of the Conspiracy

20. The manner and means by which **TIPPETT** and his co-conspirators sought to accomplish and did accomplish the purposes of the conspiracy included, but were not limited to, the following:

21. Person 1, Webb, and others known and unknown, misappropriated Company B's material, non-public information and engaged in fraudulent, noncompetitive trades and prohibited fictitious sales, including accommodation and prearranged trades, in natural gas futures contracts for their own personal gain. By entering into the fraudulent trades, Person 1, Webb, **TIPPETT**, and others caused prices to be reported, recorded, and registered that were not true, bona fide prices.

22. The fraudulent trades were reported to, entered on, and cleared through an exchange via interstate wire communications. These interstate wire communications originated from in or

around Houston, Texas and were transmitted through ICE, NYMEX, or CME servers located in Illinois.

23.     To execute the scheme, Person 1 disclosed, to Webb or **TIPPETT**, Company B's material, nonpublic information, including, but not limited to, Company B's trading interests, terms, and conditions, such as prices, purchase or sale, quantity, volume, source, delivery points, timing, and thresholds or limits to the terms to which Company B would agree to trade ("Inside Information") in violation of Person 1's duty of loyalty, trust, and confidentiality to Company B, knowing and intending that the information would be misappropriated and used by Webb, **TIPPETT**, and others to enter into prearranged trades to fill Company B's orders and offsetting trades for their personal gain.

24.     MDW Capital (through or at the direction of Webb and **TIPPETT**) misappropriated the Inside Information, filled Company B's orders, and entered into offsetting trades in the market at a profit for their personal gain.  Person 1 made his initial, prearranged bids or offers based on the terms needed to accommodate and make a profit in the offsetting trades, rather than at arms-length, bona fide terms to maximize the profit for Company B.

25.     The net profits from these fraudulent trades were split between Person 1, Webb, **TIPPETT**, and others who were involved in the particular fraudulent trade.

26.     It was further part of the scheme that Webb agreed to pay Person 1 kickbacks taken from the commission fees that Company B paid to Classic Energy.  Webb paid Person 1's portion of the unlawful profits and kickbacks to individuals acting as intermediaries, including **TIPPETT**, in order to conceal the true nature, source, and ownership of the proceeds.  **TIPPETT** agreed to and did take money from Webb which he later passed along to Person 1 and others related to or otherwise associated with Person 1.

27.     **TIPPETT's** employment at MDW and Classic Energy was part of the scheme to enable Webb to direct unlawful profits and kickbacks to Person 1 through **TIPPETT**. Having **TIPPETT** pose as an employee enabled **TIPPETT** and his co-conspirators to document certain proceeds through a Form 1099-MISC to conceal the true nature of the funds and make them appear to be the proceeds of a legitimate investment or legitimate income paid.

28.     Throughout the conspiracy, **TIPPETT** and his co-conspirators agreed to and did engage in acts to conceal the scheme, including with respect to the nature and structure of their trading and financial transactions, methods of communication and documentation, and in their interactions with others, including, Company B, market participants, the exchanges, the CFTC, and law enforcement.

## Overt Acts

29.     In furtherance of the conspiracy and to achieve the objects thereof, **TIPPETT** and his co-conspirators committed and caused to be committed at least one of the following overt acts, among others, in the Houston Division of the Southern District of Texas, and elsewhere:

30.     On or about July 13, 2015, **TIPPETT,** while working at MDW, accepted a trade from Person 1 at Company B, which was brokered by Webb for the sale of 420 lots in the Natural Gas LD1 Futures Henry Hub Futures September 2015.

31.     On or about September 2, 2015, MDW sent by wire a payment of approximately $11,655 to **TIPPETT's** bank account ending x0457.

32.     On or about September 20, 2016, **TIPPETT**, while working at Classic Energy, brokered a block trade for the sale of 150 lots in the ICE Natural Gas Day Futures Henry Hub October 2016 for Company B with a prearranged counterparty.

33.     On or about February 28, 2018, Classic Energy paid **TIPPETT** through a payroll service approximately $123,675.18 to his bank account x4727.

34.     On or about April 30, 2019, Classic Energy paid **TIPPETT** through a payroll service approximately $28,598.12 to his bank account x4727.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
(18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c))

35. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), the United States gives notice that upon Defendant's conviction of Count One of this Information, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy.

36. The United States also gives notice that it will seek a money judgment against the Defendant.

37. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendant up to the amount of the money judgment.


Jennifer Lowery  
Acting United States Attorney  
Southern District of Texas  

Joseph S. Beemsterboer  
Acting Chief, Fraud Section  
Criminal Division  
United States Department of Justice  

By:  _s/Zahra Jivani Fenelon_  
Zahra Fenelon  
Assistant United States Attorney  
Southern District of Texas  
ZFenelon@usa.doj.gov  
(713) 567-9309 (Fenelon)  

_s/Leslie S. Garthwaite_  
Leslie S. Garthwaite  
Della Sentilles  
Trial Attorneys  
Criminal Division, Fraud Section  
leslie.garthwaite@usdoj.gov  
(202) 631-6388 (Garthwaite)